Stuyvesant Sq. Apts LLC v Vorick (2026 NY Slip Op 50391(U))

[*1]

Stuyvesant Sq. Apts LLC v Vorick

2026 NY Slip Op 50391(U)

Decided on March 25, 2026

Civil Court Of The City Of New York, New York County

Stoller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 25, 2026
Civil Court of the City of New York, New York County

Stuyvesant Square Apts LLC, Petitioner,

againstJosh Vorick, Respondent.

Index No. 304941/2025

For Petitioner: Eric ZimFor Respondent: Milad Momeni

Jack Stoller, J.

Stuyvesant Square Apts. LLC, the petitioner in this proceeding ("Petitioner"), commenced this holdover proceeding against Josh Vorick, the respondent in this proceeding ("Respondent"), seeking possession of 331 East 17th Street, Apt. 1C, New York, New York ("the subject premises"), on an allegation that Respondent's occupancy of the subject premises is illegal and subjects Petitioner to civil liability. Respondent submitted an answer with defenses concerning the termination notice and with counterclaims for breach of the warranty of habitability, an order to correct violations, rent overcharge, harassment, and attorneys' fees. The Court held a trial of this matter on February 18, 2026 and adjourned the matter for post-trial submissions to March 6, 2026.
The trial record

The petition purported to terminate Respondent's tenancy pursuant to 9 N.Y.C.R.R. §2524.3(c) on the allegation that residential use the subject premises has been unlawful. Petitioner annexed to the termination notice Respondent's answer from a previous nonpayment proceeding between the parties ("the Prior Nonpayment Proceeding") defending against payment of rent on this basis. Petitioner also annexed to the termination notice a violation that the New York City Department of Buildings ("DOB") imposed on Petitioner for Respondent's residential use of the subject premises and a letter from an architect stating that Petitioner cannot legalize the residential occupancy of the subject premises because of the dimensions of an inner court adjacent to the subject premises ("the Courtyard").
Petitioner submitted into evidence a deed dated October 11, 2000. Petitioner submitted into evidence a one-year lease ("the Lease") between someone named "Askold S. Lozynskyj" ("Managing Agent") as lessor and Respondent as lessee commencing August 1, 2023 with a monthly rent of $2,500. Petitioner proved that it satisfied the registration requirements of MDL §325. Petitioner submitted into evidence a history of registrations of the subject premises with the New York State Division of Housing and Community Renewal ("DHCR") pursuant to 9 [*2]N.Y.C.R.R. §2528.3 showing that Petitioner registered the subject premises as subject to the Rent Stabilization Law. The registration history also showed that the purported legal rent in effect for the subject premises was $2,030 according to a lease expiring May 31, 2023.
The Court granted Petitioner's application to qualify Soobum You ("Petitioner's Architect") as an expert as an architect. Petitioner's Architect testified that he reviewed the subject premises to see if it could be legalized; that his understanding was that the certificate of occupancy said that it was a medical office; that he reviewed records; that the regulations of New York City define minimum sizes for the side of a courtyard; that the width of the courtyard in the building in which the subject premises is located ("the Building") is 14 feet, which is smaller than required according to the New York City Zoning Resolution; and that therefore the subject premises could not be legalized for residential occupancy. Petitioner submitted into evidence a report that Petitioner's Architect prepared that stated, inter alia, that the current approved use of the subject premises as per the certificate of occupancy is for a medical office; that there is an inner court in the Building with the dimensions of 14 feet by 27 feet; and that the distance from a legally required window to a rear or a side lot line shall be a minimum of thirty feet.
Petitioner's Architect testified that the provision of the Zoning Resolution containing the requirement for the width of the courtyard had been 23-861, but that the number was reorganized to 23-352; that the new Zoning Resolution changed the minimum dimension from 30 feet to 20 feet; that the existing size of the Courtyard is still not in compliance with the Zoning Resolution; that a unit facing a courtyard of that size cannot be used for residence because the Courtyard is less than the minimum size required by MDL §30 and Section 12 of the Building Code; and that in order to be legal, there has to be a legal window opening to a legal courtyard which complies with the Zoning Resolution.
Petitioner's Architect testified on cross-examination that he is the founder and owner of the company that wrote the report; that when he visited the subject premises he went to the entirety of the property; that he was not inside the subject premises; that he did not have to get into the subject premises to know about the size of the Courtyard; that Petitioner let him into the Courtyard; that the Courtyard is a common area; that he used a laser, which is a common method, to measure the distance; that he reviewed a survey with DOB; that the layout is a factor in terms of what use the rooms are for; that he did not see inside the subject premises because he knew how it was structured according to the DOB plans; and that the subject premises is shallow.
Respondent testified that he moved into the subject premises in 2023; that he has had only one lease; that he was not offered a renewal lease; that he paid a first month's rent, security deposit, and broker's fees; that he stopped paying rent because of water damage and exposed outlets and vermin; that Petitioner fixed one or two at a time; that he was shown the patio area; that he was told that it was exclusive use for a tenant in the subject premises; that someone who lived there before had their personal property in the area; that a broker told him that he could paint the wall of the patio if he wanted to; and that the listing of the outdoor space was what attracted him to the subject premises.
Respondent submitted into evidence the listing from an online listing service that said that the subject premises had private outdoor space. Respondent submitted into evidence the petition from the Prior Nonpayment Proceeding, an Order dated May 29, 2024 from the Prior Nonpayment Proceeding directing Petitioner to correct violations of the Housing Maintenance [*3]Code, a stipulation discontinuing the Prior Nonpayment Proceeding, and a violation issued by DOB dated October 25, 2024 for the occupation of the subject premises for residential purposes in violation of prior use of the subject premises as a medical office. Respondent submitted into evidence a list of required items put out by DOB, including a DHCR document, fire stops, a ventilation system, an engineer/installer, a certificate of occupancy, a "PW3" cost affidavit, microfilm records, a smoke detector, an electrical signoff, and a final construction signoff. 
Respondent submitted into evidence I-cards for the Building,[FN1]
which stated that the Building is an old-law tenement. Respondent submitted into evidence certificates of occupancy for the Building dating from 1982, and the following violations of the New York City Housing Maintenance Code placed by the Department of Housing Preservation and Development of the City of New York ("HPD"): "A" violations dated September 9, 2023 for painting on a riser and refrigerator gasket, "B" violations dated January 9, 2025 for a wood floor and a mortise lock, a "B" violation dated January 22, 2026 for an intercom, and "C" violations dated January 9, 2025 for rodents, roaches, and self-closing doors ("the Violations").[FN2]

Respondent testified that there were active HPD violations; that he gave access multiple times; that Petitioner did not correct the conditions; that he had access to the outdoor area of the subject premises; that from the living room is a door that opens up to a patio that has a garden that has furniture and personal property; that he has frequently used the patio; and that there is a fence between the patio and the outdoor space for the building next door.
Respondent submitted into evidence photographs of a wooden fence, of a staircase, and of a building lobby, all taken in the fall of 2025; photographs of a rat on stairs in May of 2025, a rat in grass in October of 2024; and a photograph of a hole in a closet taken October of 2024.
Respondent testified that he has found many dead rats and cleaned up after them; that he found evidence that rats had been in the subject premises, including feces; that he saw rats enter the patio; that rats came from a neighboring area; that he saw rats in the stairwell and the basement connecting to the stairwell; that he found holes in the face of the stairs; that there is an unfinished basement behind a door down the stairs in the photograph; that he experienced roaches; that there was garbage in the common area; that he saw waterbugs, silverfish, houseflies, and spiders; that the refrigerator gasket leaked; that black specks ended up on his food in the refrigerator; that the cabinets were filthy; that there were dead bugs in the hallway adjacent to the bathroom; that there were holes in the wall that pests could get through; that there was water damage; that the vanity was falling apart; that the cold water did not work; that the shower handle gets burning hot; that there are cracks in the tiles; that there are issues with the toilet; that there were gaps in the caulking; that the tub pooled water that would not drain; that there were missing baseboards in the living room; that the living room had gaps an inch wide; [*4]that he had issues with the radiator; that there was piping in the subject premises that had flaking paint; that a roach once flew and landed on the back of his neck; that there is mold and mildew in the bathroom; that there is black mold on the toilet; that the window would not stay open; that the bedroom had gaps in the baseboards between the brick wall and the drywall; that the issues with refrigerator exists to the day of his testimony; that there is no ventilation in the kitchen; that the bathroom vent does not work properly; that the exit door from the living room to the patio is not self-closing although this issue has been mitigated if not fixed; that the hole in the closet is filled with aluminum foil and has not been fixed; that baseboards are still missing; that the intercom has not been working for the past few months; and that he notified Petitioner by email and text when the conditions arose.
Respondent submitted into evidence emails that he sent to Petitioner notifying Petitioner of rats, dated September 21, 2025 and again in January of 2026. Respondent submitted into evidence an email he sent Petitioner on January 17, 2026 complaining about Petitioner's workers around the patio.
Respondent testified that he saw security footage showing people around the patio area when he was not there; that he started drawing his shades and worrying about damage by vermin or the removal of his personal property; that he used to work from home; that he is not currently employed; that he was a software engineer; that he had started his own company; that sports equipment, garden supplies, and mesh wiring were moved from the patio without his consent; that he had bought storage supplies and furniture; that he cleaned the patio; that he removed rotten wood to make it usable; that no one else used the space; that Petitioner did not say anything to stop him; and that when he gave access Petitioner would not show up or only do one or two things.
Respondent testified on cross-examination that an exterminator came to the subject premises in the early days and sprayed; that the common area of the Building does not include a sign-up sheet; that when the exterminator came it was because he had reached out; that an exterminator would show up unannounced; that this happened multiple times with different people; that the conditions he testified about were there from the date that moved in; that the broker had represented to him that Petitioner would correct the conditions before he moved in; that he has talked to therapists and his primary care physician and got prescriptions to deal with anxiety from the conditions; that he has considered moving out; and that Petitioner has told him to move out.
Respondent testified on redirect examination that the realtor who showed him the subject premises worked for Petitioner.
The Court granted Respondent's application to qualify Charles An ("Respondent's Architect") as an expert as an architect. Respondent's Architect testified that he evaluated the subject premises; that he visited the subject premises on September 9, 2025 and January 28, 2026 where he reconfirmed the dimensions of the subject premises; that he drew the subject premises in a computer program he uses called "autocab"; that he took photographs and notes and made drawings; that he used a tape measure and a laser to measure the dimensions; that he observed conditions of the Courtyard; and that he prepared a report around February 13, 2026.
Respondent submitted Respondent's Architect's report in evidence. Respondent's Architect's report stated, inter alia, that the subject premises had a bedroom, a kitchen, and a living; that bedroom has one window facing an exterior courtyard; that the living room has two windows facing the same exterior courtyard; that the window serving the bedroom satisfied light [*5]and air requirements as per the New York City Building Code, as the minimum light required per code was "9.8SF" and the light provided currently was "14.8SF"; and that the minimum air required as per the code was "4.9SF" and the air provided currently was "7.4SF".
Respondent's Architect testified that the subject premises is off of the common area level, which is technically the basement level; that the subject premises has a refrigerator, a gas range, and a full bathroom with a stand up shower; that in the living room there is a metal door which leads to the Courtyard; that there are two windows in the living room; that there is a bedroom which has one window; that in September and in January he observed the Courtyard when he exited the metal doors; that he saw deck tables, chairs, a bicycle, and personal property in the Courtyard; that the Courtyard is nicely paved with a fence; that there are fire escapes that terminate in the courtyard; that there is a bay window from the neighboring building; that there is a set of stairs that go down to the cellar; that the bathroom ceiling had been painted over; that there was some bubbling in the ceiling; that the vent over the toilet did not seem to be functioning; that the vent was covered with cardboard; that there was debris on the floor around the toilet; that he saw glue traps on the floor; that a space is a cellar when more than fifty percent of the height of the space is below street-level grade; that a space is a basement where less than fifty percent of the height of the interior space is below street-level grade; that the Building has a cellar, a basement, a first floor, a second floor, and a third floor; that the certificate of occupancy said that the cellar is to be used for building storage and that the basement and first floor are used for medical offices; that the DOB website shows any permits that have been filed and certificates of occupancy; that he found that a filing for an alteration categorized as an "Alt-1"[FN3]
was made in July of 2001 to change the use of the subject premises from a medical office to residential use; that he did not see permits for kitchen and bathroom facilities in the context of the Alt-1 application; that DOB did not approve the Alt-1 application; that there was not a safe, clear second means of egress from the rear courtyard; that on January 28, 2026 he observed a set of stairs that access the courtyard; that he could progress through those stairs in the way that an occupant would; that he viewed the path of access through the stairs by accessing the cellar; that in order for those stairs to be legal as a second means of egress for the subject premises or any fire escapes that terminate through the Courtyard, they would have to be illuminated, fire-protected, and unobstructed; that he did not observe those conditions; that when he saw it, it was too dark to photograph those conditions; that it is possible to get a conforming certificate of occupancy for the subject premises; that Petitioner would have to submit drawings as an Alt-1; that the space would have to be constructed and drawn in compliance with the Building Code; that such a permit was pulled in July of 2001; and that a 2004 audit showed that the permit was not approved.
Respondent's Architect testified on cross-examination that he did not recall the Zoning [*6]Resolution 23-861 or 23-352 as revised as they pertain to windows; that he is familiar with lot line windows, but he did not know how pertinent they were to the permit at the Building; that he did not know the dimensions for the Courtyard; that "City of Yes" means that if an owner makes a conversion from an office to residential that this is allowable, but it would not relieve an owner from safety obligations from DOB.
Managing Agent testified in rebuttal that he is the registered managing agent of the Building; that there are eight apartments in the "C" line and "B" line that avail themselves of the rear yard as a secondary means of egress; that anyone who needs to get out has to go through a stairwell that leads to a cellar of the Building and then through the cellar to the cellar of a building next door, which is an adjacent building owned by the same entity; that the doors are open and that leads to the street; that Respondent obstructed the egress with wires and furniture; that the light in the cellar and at the next-door building is on all the time; and that the obstruction was removed so that the egress was viable.
Managing Agent testified on cross-examination that he has managed the subject premises since 2001; that the owner is an LLC; that he has last been in the Building two weeks before his testimony; that he has seen the cellar; that the cellar leads to the boiler room and to the building next-door; that the furniture he saw was a box that was difficult to move; and that he moved the furniture in November of 2025.
Discussion
A ground to terminate a rent-stabilized tenancy is that the occupancy of the housing accommodation is illegal because of the requirements of law and the owner is subject to civil penalties. 9 N.Y.C.R.R. §2524.3(c). The predicate notice annexed to the petition cited that regulation and included the following attachments: Respondent's answer from the Prior Nonpayment Proceeding raising the illegal status of the subject premises as a defense to payment of rent; a DOB violation; and a letter from an architect stating why Petitioner could not legalize the residential use of the subject premises. Respondent argues that the predicate notice is inadequate.
The appropriate standard for assessment of the adequacy of a predicate notice is "reasonableness under the circumstances." Hughes v. Lenox Hill Hospital, 226 AD2d 4, 18 (1st Dept. 1996), leave to appeal denied, 90 NY2d 829 (1997). A predicate notice that cites the applicable regulation, includes a copy of the DOB violation, and a letter from an architect setting forth specific obstacles to legalizing residential use of the subject premises gives a reasonable person enough information to determine whether to vacate a dwelling or whether to remain and litigate the issue. Moreover, Respondent's defense to the Prior Nonpayment Proceeding, that residential use of the subject premises was illegal, gives rise to a context in which the predicate notice is reasonable. E. 82 LLC v. O'Gormley, 295 AD2d 173, 174 (1st Dept. 2002).[FN4]

In order to prevail on its cause of action, Petitioner must prove that it cannot amend the certificate of occupancy, 625 West End, Inc. v. Howard, 2001 NY Slip Op. 40496(U), *3 (App. Term 1st Dept. 2001), or that such an amendment is unduly burdensome. McDonnell v. Sir Prize Contr. Corp., 32 AD2d 660 (2nd Dept. 1969), Zaccaro v. Freidenbergs, 10 Misc 3d 143(A)(App. Term 1st Dept. 2006), Hart-Zafra v. Singh, 21 Misc 3d 1142(A)(S. Ct. NY Co. 2004)(Richter, J.), [*7]Kaur v. Sobhey, 5 Misc 3d 1012(A)(Civ. Ct. Kings Co. 2004)(Mendez, J.). Petitioner's proof to this point consisted of Petitioner's Architect's evidence concerning the size of the Courtyard.
Every room in a residential unit shall have at least one window opening directly upon a street or upon a lawful yard or court. MDL §§30(2), 30(3). A lawful yard must be at least 30 feet deep, MDL §26(5)(b), unless the Zoning Resolution allows for a smaller yard. Id., MDL §26(7)(a). See Also N.Y.C. Admin. Code §27-733(a)(the yard that such windows face must be of the dimensions required by the applicable provisions of the Zoning Resolution). The Zoning Resolution, at 23-352(a),[FN5]
provides that where legally required windows face onto an inner court, for portions of buildings below 75 feet in height, the area of an inner court shall not be less than 800 square feet, and the minimum dimension of such inner court shall not be less than 20 feet.[FN6]

Petitioner's Architect submitted evidence that the minimum dimension of the Courtyard is 14 feet, less than the 20 feet required by the Zoning Resolution. Petitioner's Architect further submitted evidence that the dimensions of the Courtyard measure 14 feet by 27 feet, or 378 square feet, less than half of that required by the Zoning Resolution. As a prima facie matter, then, Petitioner shows that the current dimensions of the Courtyard would prevent the legalization of the subject premises for residential use.
Respondent's Architect did not rebut either Petitioner's Architect's measurements nor his citation of the Zoning Resolution. Rather, Respondent's Architect's report argued that the square footage of light and air that the bedroom received satisfied the requirements of the New York City Building Code.
Respondent's Architect stated that the amount of light and air required were 9.8 square feet and 4.9 square feet, respectively. The source of these figures is not clear from the record or from applicable authority. For what it's worth, required sources of natural light shall have an aggregate transmitting area of at least ten percent of the floor area of the room or space served. N.Y.C. Admin. Code §27-734. For basement apartments like the subject premises, the aggregate area of windows must be slightly larger, to wit, one-eighth of the horizontal area of the room. MDL §34(d).
Assuming arguendo that the square footage of the natural light sources in the subject premises satisfy the requirements set forth in the statutes cited above,[FN7]
the statutory language imposing special requirements on windows facing courtyards remains, as does the language requiring compliance with the Zoning Resolution. The Court must avoid a construction of a statute that would render statutory language to be superfluous. NY Cty. Lawyers' Ass'n v. Bloomberg, 95 AD3d 92, 101 (1st Dept. 2012). Satisfaction of one statutory provision concerning the size of natural light sources does not nullify a separate statutory provision specific to windows facing courtyards.
As Petitioner has established that the current size of the Courtyard precludes the [*8]legalization of the subject premises for residential purposes, Petitioner does not have to prove the infeasibility of doubling the size of the Courtyard while maintaining a recognizable current composition of the Building. Petitioner has therefore proven its cause of action.
Respondent counterclaimed for breach of the warranty of habitability. The measure of damages for breach of the warranty of habitability is the difference between the rent reserved under the lease and the value of the premises during the period of the breach. Park West Management Corp. v. Mitchell, 47 NY2d 316, 329, cert. denied, 444 U.S. 992 (1979), Elkman v. Southgate Owners Corp., 233 AD2d 104, 105 (1st Dept. 1996). As a landlord may not lawfully collect any rent for an apartment for which residential use is prohibited, MDL §302(1)(b), there is no lawful predicate for a rent abatement. The apartment is uninhabitable by definition, and Respondent therefore incurs no liability for rent or use and occupancy. Jo-Fra Props., Inc. v. Bobbe, 81 AD3d 29, 34 (1st Dept. 2010), leave to appeal dismissed, 17 NY3d 933 (2011), Jalinos v. Ramkalup, 255 AD2d 293, 294 (2nd Dept. 1998). Put another way, there is no rent to abate.
Respondent counterclaims for rent overcharge. "Rent" for purposes of determining an overcharge has a specialized definition according to the Rent Stabilization Code, to wit, the rent indicated in the most recent reliable annual registration statement plus any subsequent lawful increases and adjustments. N.Y.C. Admin. Code §26-516(a)(i).
The registered rent immediately before Respondent's occupancy was $2,030 according to a lease expiring May 31, 2023. Respondent signed a one-year vacancy lease commencing on August 1, 2023 with a monthly rent of $2,500, which would entitle Petitioner to a one-year increase as per the Rent Guidelines Board ("RGB"). 9 N.Y.C.R.R. §2522.8(a)(1). The Court can take judicial notice of RGB-approved increases. See, e.g., Curry v. Battistotti, 5 Misc 3d 1012(A)(Civ. Ct. NY Co. 2004), aff'd, 12 Misc 3d 129(A)(App. Term 1st Dept. 2006). A one-year lease commencing August 1, 2023 would entitle Petitioner to an increase of 3.25%. RGB Order 54. An increase of 3.25% over $2,030 is $2,095.98. Respondent testified that he paid one months' rent, which Petitioner did not rebut. Respondent can only collect overcharge damages for any month that he paid, N.Y.C. Admin. Code §26-516(a), so Respondent's recovery is limited to that one month. Respondent therefore paid $404.02 above the legal regulated rent. Such a showing further entitles Respondent to treble damages as a prima facie matter, 9 N.Y.C.R.R. §2526.1(a)(1), particularly as Petitioner made no showing rebutting willfulness. Three times $404.02 is $1,212.06.
As a cause of action for rent overcharge only applies to housing subject to the Rent Stabilization Law, N.Y.C. Admin. Code §26-516(a), Petitioner argues that the non-residential status of the subject premises precludes an application of the Rent Stabilization Law thereto, citing in support Wolinsky v. Kee Yip Realty Corp., 2 NY3d 487, 493 (2004) and Tan Holding Corp. v. Wallace, 187 Misc 2d 687, 688-89 (1st Dept. 2001).[FN8]
While these cases support the proposition that a premises incapable of legalization for residential use is not subject to the Rent Stabilization Law, they are in tension with the holding of Gracecor Realty Co. v. Hargrove, 90 NY2d 350 (1997), which liberally construes the definition of a "housing accommodation" in the [*9]Rent Stabilization Code as [t]hat part of any building or structure, occupied or intended to be occupied by one or more individuals as a residence, home, dwelling unit or apartment . . . ." 9 N.Y.C.R.R. §2520.6(a). The harmonization of these propositions entails a restriction of the rule articulated in Wolinsky and Tan to cases involving Interim Multiple Dwellings as per Article 7-C of the MDL, i.e., lofts. Joe Lebnan, LLC v. Oliva, 39 Misc 3d 31, 33-34 (App. Term 2nd Dept. 2013), Consulting SS Inc. v. McKellar, 2022 NY Slip Op. 33213(U)(Civ. Ct. Kings Co.), aff'd, 84 Misc 3d 128(A)(App. Term 2nd Dept. 2024), Edison 1205 LLCv. Brickhouse, 58 Misc 3d 1229(A)(Civ. Ct. Queens Co. 2018). A dwelling's Rent Stabilization status therefore turns on the function of its units, not the legality of their usage in contravention of a certificate of occupancy. 325 Mgt. Corp. v. Statuto, 220 AD3d 524 (1st Dept. 2023), Balay v. Manhattan 140 LLC, 204 AD3d 491, 493 (1st Dept. 2022). Accordingly, a commercial unit used for residential purposes can be Rent-Stabilized. See, e.g., Golden Horse Realty Inc. v. New York State Div. of Hous. & Comm. Renewal, 2018 NY Slip Op. 30636(U)(S. Ct. NY Co.), aff'd, 173 AD3d 612 (1st Dept. 2019).
The apparent ongoing (if illegal) residential use of the subject premises also tends to negate another objection to its coverage under Rent Stabilization, that housing accommodations are exempt when they are used "exclusively" for professional, commercial, or other nonresidential purposes. 9 N.Y.C.R.R. §2520.11(n). Respondent has been using the subject premises for residential purposes, and the registration history shows prior residential tenants as well. While the status of the subject premises has not been residential, its use has been.
Respondent also seeks relief concerning his payment of one month's security deposit which, again, Petitioner did not rebut. A landlord of a Rent-Stabilized tenant may only collect a security deposit in the amount of one month's rent. 9 N.Y.C.R.R. §2525.4. As DHCR may use rent overcharge remedies regarding a landlord's collection of an excess security deposit, 985 Fifth Avenue v. State Div. of Hous. & Cmty. Renewal, 171 AD2d 572, 573(1st Dept.), leave to appeal denied, 78 NY2d 861 (1991), 554 W. 181, LLC v. New York State Div. of Hous. and Community Renewal, 30 Misc 3d 1233(A)(S. Ct. NY Co. 2011), and Respondent's choice to invoke the concurrent jurisdiction of this Court to hear this claim controls, N.Y.C. Admin. Code §26-216(a)(2), Collazo v. Netherland Prop. Assets LLC, 35 NY3d 987, 990 (2020), this Court may afford Respondent a remedy for Petitioner's charge of an excess security deposit. See Triumph Baptist Church Inc. v. Anderson, 64 Misc 3d 1238(A)(Civ. Ct. NY Co. 2019), Wai Chan v. Gao Xiao Ying, 10 Misc 3d 1065(A)(Civ. Ct. NY Co. 2005). Respondent's recovery is limited to the excess security deposited, however, 985 Fifth Avenue, supra, 171 AD2d at 573, 554 W. 181, LLC, supra, 30 Misc 3d at 1233(A), which is also $404.02.
Respondent also counterclaims for harassment. Harassment applies to residents of "dwelling units." N.Y.C. Admin. Code §27-2004(a)(48). A "dwelling unit" is any residential accommodation in a multiple dwelling or a private dwelling, N.Y.C. Admin. Code §27-2004(a)(13), a definition that is narrower than a "dwelling," which applies to any portion of a building or structure occupied as a home, residence, or sleeping place. N.Y.C. Admin. Code §27-2004(a)(3). Each word used in a statute expresses a distinct and different idea, Tonis v. Bd. of Regents, 295 NY 286, 293 (1946), and effectuates some useful purpose. McGowan v. Mayor of NY, 53 NY2d 86, 95 (1981). The application of the harassment cause of action to occupants of "dwelling units" as opposed to mere "dwellings" therefore evinces an intention to limit the cause of action to occupants of residential accommodations. Myers v. Schneiderman, 30 NY3d 1, 12 (2017)(where a law expressly describes a particular thing to which it shall apply, the Court [*10]must draw an "irrefutable inference" that the Legislature intended to omit or exclude what the Legislature omitted or excluded).
The Housing Maintenance Code, however, does not make such a distinction when it comes to the correction of violations therein. Indeed, HPD can place Housing Maintenance Code violations in areas that are not used as residences, such as the public areas of buildings. N.Y.C. Admin. Code §27-2115(g). Given that the Violations, in the record, are prima facie proof of the conditions therein, MDL §328(3), and that the Court's statutory mandate is to enforce housing standards, New York City Civil Court Act §110(c), Respondent's counterclaim for an order to correct has merit.
Respondent counterclaims for attorneys' fees. Respondent can only obtain a judgment for attorneys if Respondent is the prevailing party, meaning that he prevailed on the central claims advanced and received substantial relief in consequence thereof. 542 E. 14th St. LLC v. Lee, 66 AD3d 18, 24-25 (1st Dept. 2009). As the "central relief sought" in a holdover proceeding is a judgment of possession, Nestor v. McDowell, 81 NY2d 410, 416 (1993), a judgment of possession in favor of Petitioner demonstrates that Respondent is not the prevailing party. Soho Vill. Realty, Inc. v. Gaffney, 188 Misc 2d 261 (App. Term 1st Dept. 2001). Moreover, a determination of prevailing party status entails consideration of the true scope of the dispute litigated and a comparison of what was achieved within that scope. 49 E. Owners' Corp. v. 825 Broadway Realty, LLC, 224 AD3d 493 (1st Dept. 2024). The trial record shows that the amenability of the subject premises to legalization dominated the dispute between the parties in this case. Respondent did not prevail in that dispute.
Accordingly, it is
ORDERED that the Court awards Petitioner a final judgment of possession only against Respondent, and it is further
ORDERED that issuance of the warrant of eviction is permitted forthwith, with execution thereof stayed through April 30, 2026 for Respondent to vacate, on default of which the warrant may execute after service of a marshal's notice, with the earliest eviction date being May 1, 2026, and it is further
ORDERED that the Court dismisses Respondent's counterclaim sounding in breach of the warranty of habitability, and it is further
ORDERED that the Court awards Respondent a judgment against Petitioner on his rent overcharge counterclaim in the amount of $1,616.08, and it is further
ORDERED that the Court dismisses Respondent's counterclaim sounding in harassment, and it is further
ORDERED that the Court grants Respondent's counterclaim to the extent of directing Petitioner to correct the Violations on statutory time frames on access dates to be arranged between the parties.
This constitutes the decision and order of this Court.
Dated: March 25, 2026New York, New YorkHON. JACK STOLLERJ.H.C.

Footnotes

Footnote 1:I-cards provide evidence of an inspector's observations of a building and thus of the nature of the use or occupancy thereof. 345 W. 70th Tenants Corp. v. N.Y.C. Envtl. Control Bd., 143 AD3d 654, 654-55 (1st Dept. 2016).

Footnote 2:A class "A" violation is "non-hazardous" pursuant to N.Y.C. Admin. Code §27-2115(c)(1); class "B" violation is "hazardous" pursuant to N.Y.C. Admin. Code §27-2115(c)(2); and a class "C" violation is "immediately hazardous" pursuant to N.Y.C. Admin. Code §27-2115(c)(3). Notre Dame Leasing LLC v. Rosario, 2 NY3d 459, 463 n.1 (2004).

Footnote 3:An "alt-1 application" refers to an "Alteration Type 1 application", the type of application filed with DOB for a permit to change a use of a building in New York. See, e.g., Bibi Lieberman 1999 Revocable Trust Dated 11/24/99 v. City of New York, 43 Misc 3d 1216(A)(S. Ct. Kings Co. 2014), Harlem Real Estate LLC v. New York City Economic Development Corporation, 2009 NY Slip Op. 31240(U)(S. Ct. NY Co.), affirmed as modified, 82 AD3d 562 (1st Dept.), leave to appeal denied, 17 NY3d 717 (2011), Cashew Holdings LLC v. Thorpe-Poyser, 2018 N.Y.L.J. LEXIS 3486 (Civ. Ct. Queens Co.).

Footnote 4:The Court also previously denied a prior motion of Respondent to dismiss this proceeding on the argument that the predicate notice is inadequate. NYSCEF #38.

Footnote 5:This section of the Zoning Resolution can be found at 
https://zr.planning.nyc.gov/article-ii/chapter-3#23-352 

Footnote 6:The evidence in the record that the subject premises is a basement apartment supports the inference that the subject premises is in a portion of the Building which is lower than 75 feet.

Footnote 7:Respondent's Architect did not make a similar representation with regard to the living room.

Footnote 8:Petitioner's registration of the subject premises with DHCR pursuant to 9 N.Y.C.R.R. §2528.3 would not estop Petitioner from making its argument because parties cannot create such coverage by their own acts. Trainer v. State of NY Div. of Hous. & Community Renewal, 162 AD3d 461, 462 (1st Dept. 2018).